**CANDOR HOSIERY MILLS, INC., Plaintiff,**

v.

**INTERNATIONAL NETWORKING GROUP, INC., Defendant.**

**Civil No. 1:97CV01284.**

United States District Court, M.D. North Carolina.

Nov. 9, 1998.

David Coventry Smith, W. Rickert Hinnant, Allman Spry Leggett & Crumpler, PA, Winston–Salem, NC, for Plaintiff.

Derek J. Allen, Jeffrey E. Oleynik, Brook Pierce McLendon Humphrey & Leonard, Greensboro, NC, for Defendant.

## MEMORANDUM OPINION

BULLOCK, Chief Judge.

This action began when Plaintiff Candor Hosiery Mills ("Candor") filed suit against Defendant International Networking Group, Inc. ("ING") in the General Court of Justice, Superior Court Division, Moore County, North Carolina. Defendant ING removed the action to federal court, alleging diversity jurisdiction. Plaintiff responded by moving to remand the case to state court, on the ground that the jurisdictional amount was lacking. Because the court finds that Defendant has made an adequate showing that requirements of 28 U.S.C. § 1332 are met, Plaintiff's motion will be denied.

## BACKGROUND

This case arises out of certain alleged business dealings between Candor, ING, and a third company called "Thank Goodness for Socks" ("TGF"). Candor is a North Carolina corporation engaged in the manufacture and sale of socks and hosiery. One way in which Candor conducts business is by obtaining licenses from other companies in the industry to manufacture and sell products under the licensor's trademarks. TGF no longer exists as an independent entity, but it once conducted business in a manner similar to that attributed to Candor. ING is a New York corporation which finds licensing opportunities for manufacturers, and it receives its compensation on a commission basis.

Both parties agree that ING and TGF entered into a number of representation agreements between 1995 and 1997. Pursuant to these agreements, TGF retained ING as its "exclusive licensing agent" with regard to the licensing of trademarks by certain licensors. In each case TGF agreed that if it obtained a licensing agreement with a particular licensor based upon an introduction by ING, it would pay ING a one per cent (1%) commission on all "Net Sales" over the life of the license, including all amendments, options, or extensions. In an agreement dated March 2, 1995, TGF and ING established such a relationship regarding the "B.U.M. Equipment" trademark. In an agreement dated March 28, 1997, they established such a relationship regarding the "Airwalk" trademark.

Pursuant to an agreement of purchase and sale dated July 14, 1997, Candor alleges it purchased the assets of TGF. The parties choose to characterize this transaction differently. ING argues than it constituted a merger, and that in so doing Candor assumed all duties and obligations of TGF, including the commitment to pay commissions to ING under the representation agreements described above. Candor contends that through the transaction Candor only purchased "certain" assets of TGF, and that therefore the original representation agreements are irrelevant to the question of whether any representation agreements exist between Candor and ING.

On September 1, 1997, Candor and Items International (the licensor of the Airwalk trademark) entered into a licensing agreement under which Candor received a license to the Airwalk trademark through 2000. In the agreement Candor guaranteed Items International a sum of royalties on the Airwalk trademark which translates into minimum sales of $12 million over the three-year life of the agreement. On October 1, 1997, Candor and B.U.M. International (the licensor of the B.U.M. trademark) entered into a licensing agreement under which Candor received a license to the B.U.M. trademark through 2002. In the agreement, Candor again guaranteed a sum of royalties to the licensor, which in this case translates into minimum

sales of products with the B.U.M. trademark totaling $15 million.

On October 6, 1997, ING made a demand upon Candor to pay commissions on sales of B.U.M. and Airwalk products pursuant to the earlier representation agreements signed with TGF. Candor responded on October 9 with a letter in which it disavowed any obligation to pay ING commissions on B.U.M. and Airwalk sales. On October 28, ING made a final demand of payment by November 4, 1997, a deadline which was not met by Candor.

This litigation began on November 5, 1997, with Candor's filing of a state court action in Moore County, North Carolina, seeking declaratory relief. Candor requested in its complaint that the court find that no representation agreements exist between Candor and ING regarding sales of products carrying the B.U.M. and Airwalk trademarks. Candor sought further that, even if the court found such an agreement or agreements to exist, it find that no commissions are owed ING under the terms of such agreement(s). On December 11, 1997, ING removed the suit to federal court, asserting diversity jurisdiction. Candor responded with a motion to remand to state court on the ground that diversity jurisdiction is not present. It concedes that the parties are of diverse citizenship, but argues that ING has not demonstrated that the amount in controversy exceeds $75,000.00. The court stayed its ruling on the motion to remand to allow the parties to conduct discovery on this issue.

## ANALYSIS

Section 1441 of the federal Civil Code allows a defendant to remove an action to federal court if the case originally could have been brought there. In this case, the basis for removal is diversity of citizenship. Section 1332 limits diversity jurisdiction to cases in which the amount in controversy exceeds $75,000.00.

The burden of establishing federal jurisdiction lies on the party seeking to litigate in federal court. *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). When a case has been removed the defendant bears the burden of showing that federal jurisdiction has been invoked properly. *Mulcahey v. Columbia Organic Chems. Co., Inc.*, 29 F.3d 148, 151 (4th Cir.1994) ("The burden of establishing federal jurisdiction is placed upon the party seeking removal."); *see also* 14C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper ("Wright and Miller"), *Federal Practice and Procedure* § 3739 at 423–24 (3d ed. 1998) ("It is also well-settled under the case law that the burden is on the party seeking to preserve the district court's removal jurisdiction, typically the defendant, ... to show that the requirements for removal have been met.").

What a defendant must show upon removing a case to federal court differs depending on the circumstances of the case. Normally, the plaintiff's complaint controls on the issue of whether a sufficient amount is in controversy for purposes of diversity jurisdiction. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288, 58 S.Ct. 586, 82 L.Ed. 845 (1938).[1] When a plaintiff seeks declaratory relief, however, the complaint states no amount in controversy. In such a situation, a federal court must determine the "value of the object of the litigation" to ascertain the jurisdictional amount. *Hunt v. Washington*

---

1. The issue of whether the value of compulsory counterclaims asserted by a defendant should figure into a court's determination of the amount in controversy when a defendant has removed a case to federal court has troubled a number of courts. Decisions of district courts within this circuit point in both directions as to what the appropriate rule should be. *Compare Burton Lines, Inc. v. Mansky*, 265 F.Supp. 489 (M.D.N.C. 1967) (holding compulsory counterclaim may not be considered when calculating amount in controversy) *with Congaree Broadcasters, Inc. v. TM Programming, Inc.*, 436 F.Supp. 258 (D.S.C.

1977) (holding counterclaim may be considered when calculating amount in controversy). According to Wright and Miller, the majority rule favors exclusion of the value of counterclaims, even if compulsory. *See* 14B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper 3706 at 215 (3d ed.1998). In any event, the issue does not impact the outcome here, since the court finds the jurisdictional amount to be evident from Plaintiff's complaint, without the necessity of considering any counterclaims asserted by ING in its answer.

*State Apple Adver. Comm'n*, 432 U.S. 333, 347, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The Fourth Circuit adheres to the "either party" rule when engaging in this analysis; under this approach, the court must calculate the potential pecuniary impact of the judgment to either party. *Government Emp. Ins. Co. v. Lally*, 327 F.2d 568, 569 (4th Cir.1964). Thus the Defendant in this case must demonstrate that the value of any commissions which may be owed to ING under any agreements between Candor and ING with respect to the Airwalk and B.U.M. trademarks exceeds $75,000.00 from the point of view of either ING or Candor.[2]

Although the substance of what ING must show in this case is clear, the degree of certainty with which it must present such proof is not. The Fourth Circuit has not addressed the issue of the nature of a defendant's burden in cases where the defendant has removed the case on diversity grounds and plaintiff's complaint is silent on jurisdictional amount.[3] *See Gwyn v. Wal–Mart Stores, Inc.*, 955 F.Supp. 44, 46 (M.D.N.C. 1996). Furthermore, courts of other jurisdictions which have ruled on the issue apply a variety of standards, ranging from requiring a defendant to show to a legal certainty that $75,000.00 is surpassed to requiring the defendant to show only that it does not appear to a legal certainty that $75,000.00 is not surpassed. *See* 14C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper § 3725 at 89 (3d ed. 1998) ("Courts have employed numerous different standards to assess the adequacy of a defendant's showing

that the amount in controversy requirement is satisfied.").

■ Decisions of other district courts within the Fourth Circuit suggest the emergence in this circuit of a burden which lies between the extremes described above, namely that the defendant must show by a preponderance of the evidence that the jurisdictional amount is present.[4] *Gwyn*, 955 F.Supp. at 46; *see, e.g., Landmark Corp. v. Apogee Coal Co.*, 945 F.Supp. 932, 935 (S.D.W.Va.1996) ("A defendant that removes a case from state court in which the damages sought are unspecified, asserting the existence of federal diversity jurisdiction, must prove by a preponderance of the evidence that the value of the matter in controversy exceeds the jurisdictional amount."); *but see Mullins v. Harry's Mobile Homes, Inc.*, 861 F.Supp. 22, 23 (S.D.W.Va.1994) (applying legal certainty rule), and *White v. J.C. Penney Life Ins. Co.*, 861 F.Supp. 25, 27 (S.D.W.Va. 1994) (applying legal certainty rule). Stated differently, to avoid remand a defendant must show that it is more likely than not that the amount in controversy exceeds $75,-000.00. *Landmark*, 945 F.Supp. at 935.

Furthermore, the court finds persuasive the rationale given for the preponderance rule by other circuits which employ it. The rule preserves the defendant's right to remove appropriate cases to federal court without unduly expanding the scope of diversity jurisdiction for purposes of removal, and it still yields some deference to plaintiff's choice of forum. *See, e.g., Tapscott v. MS*

---

**2.** It would be improper to weigh the merits of the case when attempting to assess the value of the object of litigation. *See St. Paul Mercury*, 303 U.S. at 289, 58 S.Ct. 586 (noting fact that complaint reveals a valid defense to plaintiff's claim does not oust federal court jurisdiction); *Work v. U.S. Trade, Inc.*, 747 F.Supp. 1184, 1186 (E.D.Va.1990) ("Even when the complaint discloses a valid defense to plaintiff's action, the sum claimed by plaintiff controls.").

**3.** Thus, this case differs from *Wiggins v. North Am. Equitable Life Assurance Co.*, 644 F.2d 1014 (4th Cir.1981), in which defendant removed a case where plaintiff in its original complaint sought $9,000.00 in compensatory damages and $100,000.00 in punitive damages. Plaintiff prevailed on its motion to remand in *Wiggins* by demonstrating to a legal certainty that under

Maryland law punitive damages were not recoverable.

**4.** Both parties' reliance upon certain authorities to suggest that the proper standard in the Fourth Circuit is an inverted legal certainty rule (defendant must show that it does not appear to a legal certainty that less than $75,000.00 is in controversy) is misplaced. The case of *McDonald v. Patton*, 240 F.2d 424 (4th Cir.1957), and the discussion at 15 *Moore's Federal Practice* § 102.106(1) (3d ed.1997) both deal with the burden upon plaintiff when plaintiff files in federal court and relies upon diversity jurisdiction. The situation here, where Candor filed a state court action which ING removed to federal court, is altogether different. *See* 16 *Moore's Federal Practice* § 107.14(2)(g)(v) (3d ed.1997).

*Dealer Serv. Corp.,* 77 F.3d 1353, 1356–57 (11th Cir.1996); *Gafford v. General Elec. Co.,* 997 F.2d 150, 155–60 (6th Cir.1993); 14C Wright & Miller § 3725 at 95 (3d ed.1998).

■ Thus, to avoid remand in the instant case, ING must demonstrate that it is more likely than not that the value of the object of this litigation to either party exceeds $75,-000.00. In making its presentation on this issue, ING relies not only upon commissions allegedly owed at the time of removal, but also on future commissions to which it argues it will be entitled over the life of Airwalk and B.U.M. licenses if valid representation agreements are found to exist. Candor disagrees with the propriety of considering such "future damages" when calculating the value of the object of litigation. Candor contends that as a matter of law the court can consider only those damages allegedly accrued as of removal.

By seeking a declaration as to the existence or non-existence of representation agreements between Candor and ING, Candor put the entire contracts in issue and thus their total value. The declaratory judgment action was not brought simply to resolve Candor's liability to ING for commissions which accrued prior to November 5, 1997, on sales of Airwalk and B.U.M. products. Candor's first prayer for relief in its complaint states that "Plaintiff Candor is entitled to a declaratory judgment holding that defendant has no agreement with Candor to be paid any fees arising from execution of any licenses for the use of the B.U.M. and Airwalk trademarks." (Compl. § 15). Thus the suit brought into controversy not simply two months' and one month's worth of commissions (the time the Airwalk and B.U.M. licensing agreements had been in effect at the time of the suit), but rather the existence of agreements which, if found to exist, might entitle ING to substantial sums of money in the future. It is proper, then, to examine the total value of the alleged agreements to either party to determine the value of the object of the litigation.

The United States Supreme Court case of *Aetna Cas. & Surety Co. v. Flowers,* 330 U.S. 464, 67 S.Ct. 798, 91 L.Ed. 1024 (1947), is illustrative on this point. In that case the plaintiff brought an action in state court to determine whether she was entitled to death benefits under Tennessee's workman's compensation law. Her husband's employer removed the action to federal court and plaintiff moved to remand, alleging that the jurisdictional minimum (then $3,000.00) was not present. In holding that remand was not warranted, the Supreme Court addressed the fact that the plaintiff was not entitled to $3,000.00 in benefits as of removal and might never recover $3,000.00 if she remarried or died before a certain date in the future. The Court pointed out that the "statute which creates liability for the award contemplates a single action for the determination of claimant's right to benefits and a single judgment for the award granted." *Aetna,* 330 U.S. at 467–68, 67 S.Ct. 798. The Court went on to distinguish the situation where a plaintiff would enjoy only a contingent right to future recovery from the situation in *Aetna* where the right to future payments was unconditional, but potentially could be cut off by operation of a condition subsequent. *Id.* at 468. The Court concluded with the observation that "there is no suggestion that by reason of life expectancy or law of averages the maximum amount recoverable can be expected to fall below the jurisdictional minimum." *Id.*

As in *Aetna,* the instant case puts both the right to past and future recovery at stake, not simply the right to payments owing as of the date of removal. Therefore, to measure the amount in controversy it is necessary to determine the value of the agreements in their entirety. ING has made its case for such value exceeding the jurisdictional minimum by pointing to the guaranteed royalties in the Airwalk and B.U.M. licensing agreements. In those licenses, Candor guaranteed $960,000.00 in royalties over three years and $900,000.00 in royalties over five years, respectively. Based on the fact that Candor pays eight per cent (8%) of its sales to Items International and six per cent (6%) of sales to B.U.M. in royalties, these guarantees translate into guaranteed minimum sales of $12 million on the products carrying the Airwalk trademark and $15 million in products

carrying the B.U.M. trademark. Although ING is paid commissions based on Net Sales rather than on guaranteed minimum sales, ING suggests these figures as the best means of gauging the total value of the alleged representation agreements to ING.

    ■ Candor contends that since commissions are paid to ING with reference to Net Sales, any attempt to consider future sales would force the court to engage in speculation. Although it is possible that future sales will fall below the guaranteed minimums, ample evidence exists in the record to suggest that these guaranteed minimums are in fact a good yardstick for measuring the minimum value of the alleged representation agreements. In his deposition, ING president Steven Seidman conceded that ING is not paid based on guaranteed minimum sales. (Seidman Dep. at 307–10). But Seidman also testified that he had never been involved in a licensing deal concerning another representation agreement where the licensee's actual sales did not reach the guaranteed minimum level. (*Id.* at 313, 326–27). Furthermore, despite the fact that sales figures of the Airwalk and B.U.M. products were "disappointing" during the first few months of the 1997 licenses, Seidman stated that "the B.U.M. license agreement is phenomenal; it is skyrocketing. So I think that in that case they could exceed the business plan." (*Id.* at 222–23). Seidman admitted, however, that future sales under the Airwalk license were much more in question. (*Id.* at 222). But even if Candor does not sell a single product carrying the Airwalk trademark in the future, if B.U.M. sales meet or exceed the guaranteed minimum ING will be entitled to at least $150,000.00, double the jurisdictional amount.

    Based on this record the court is convinced that future commissions which may be owed ING are properly considered when calculating the value of the object of litigation and that ING has demonstrated that it is more likely than not that such value exceeds $75,-000.00. This outcome is consistent with the cases within this circuit cited by the parties. *See Broglie v. MacKay–Smith,* 541 F.2d 453, 455 (4th Cir.1976) (holding that "[d]amages which the plaintiff claims will accrue in the future are properly counted against the jurisdictional amount if 'a right to future payments ... will be adjudged in the present suit.'"); *Landmark,* 945 F.Supp. at 937 (excluding future damages from calculation where plaintiff sought only damages owing as of trial, but noting that had plaintiff "demanded a judgment for prospective relief flowing infinitely into the future or a declaration concerning the meaning of the contract ... the amount in controversy would be met"); *Beaman v. Pacific Mut. Life Ins. Co.,* 369 F.2d 653 (4th Cir.1966) (excluding future benefits from calculation where right to future payment was contingent upon continuation of disability status). These cases teach that the "relief sought in the complaint" controls. *Landmark,* 945 F.Supp. at 937. Therefore, Candor implicated the contracts in their entirety by seeking a declaration as to their existence or non–existence.[5] *Id.*

    The court's conclusion is also consistent with that reached by another district court within the Fourth Circuit in the recent case of *Lien v. H.E.R.C. Prods., Inc.,* 8 F.Supp.2d 531 (E.D.Va.1998). The plaintiff Lien and defendant H.E.R.C. stood in an employee-employer relationship, with Lien receiving compensation on a commission basis. After Lien negotiated a large contract with the Navy, there arose a dispute between Lien and H.E.R.C. over their employment agreement and the commissions owed to Lien. Lien brought suit in state court, seeking $33,355.00 plus those commissions due as of the date of trial, as well as the right to sue for additional commissions due over the life of the Navy contract. H.E.R.C. removed the

---

**5.** The Seventh Circuit reached the same conclusion in the case of *Davis v. American Foundry Equip. Co.,* 94 F.2d 441 (7th Cir.1938). In that case plaintiff claimed to have a licensing agreement with defendant whereby the defendant agreed to pay plaintiff $500.00 up front and $500.00 per year during the life of the patent. Four years after the contract was executed, the plaintiff brought a declaratory action seeking a determination of the validity of the contract. Although only $2000.00 allegedly was due to date, the court found the jurisdictional minimum of $3,000.00 met because the "value in controversy is the value of that which is sought to have declared free of doubt, namely the contract for $9,500." *Davis,* 94 F.2d at 443.

claim to federal court and plaintiff moved to remand.

Lien conceded in oral argument that he "sought a decision on the validity of the entire contract." *Lien,* 8 F.Supp.2d at 534. Based on this admission, the court looked to the entire value of the agreement in dispute. *Id.* In so doing, it found the jurisdictional minimum satisfied even though Lien argued that the value of future commissions could not be determined with certainty. *Id.* The court determined that defendant had met its preponderance burden, given that if the contract was valid plaintiff likely would be entitled to greater than $100,000.00 in commissions based on jobs already "lined up" between H.E.R.C. and the Navy over the next two years. *Id.* at 533–34.

## CONCLUSION

Because ING has demonstrated by a preponderance of the evidence that the value of the object of this litigation exceeds $75,-000.00, remanding the case to state court would be improper.